PER CURIAM.
Appellant Stephen Ober (Ober) appeals from an order of the Department of Environmental Protection (D.E.P.) reversing the recommendation of a hearing officer, thus denying Ober reimbursement for the clean-up of storage tanks and contaminated soil on Ober’s property. We reverse.
Ober is the owner of property in Daytona Beach which had been leased and used as an AAMCO transmission shop in the 1980’s. The property contained five underground storage tanks and a 55 gallon oil/water separator. In 1987, the Volusia County Environmental Control Division inspected the site and determined that it was contaminated. Ober hired an environmental contractor to remove, clean and dispose of the underground storage tanks and to remove and clean the soil. This was accomplished, and the contractor filed a closure report. According to the report four of the six tanks had multiple holes ranging from pin size to one inch in diameter.
In January 1991, Ober applied for entry into the Abandoned Tank Restoration Program in accordance with section 376.305(7), Fla. Stat.[1] This program provides financial assistance to clean a site contaminated by petroleum or petroleum products. In July 1991, the site was determined to be “clean” by County officials. On August 16,1991, the Department of Environmental Regulation[2] informed Ober that “the contamination related to the storage of ‘petroleum, products as defined in Section 376.301(1), Fla. Stat., at this site is eligible for reimbursement of allowable costs pursuant to Section 376.305(7), Fla. Stat., under the Abandoned Tank Restoration Program.” (emphasis added) On February 14, 1992, Ober submitted his request for reimbursement for the clean-up and related costs, which amounted to $46,765.24.
In April 1993 D.E.P. denied Ober’s request for reimbursement on the basis of its conclusion that the costs claimed were occasioned by surface spillage of ineligible contaminants; that the source of contamination was overfilled 55-gallon drums and other improper disposal and storage methods; and that the underground storage system was not the source of contamination of the facility. Ober then filed a petition for administrative hearing.
At the hearing, Edward Smith testified for Ober. Smith is a state certified pollutant storage systems specialty contractor and was the project manager for the clean-up activities at the site. Roger Register and Brian King, both employees of D.E.P., testified on behalf of the Department. In his recommended order, the hearing officer stated the issue to be “... whether the contamination at issue regarding the underground storage tanks was the result of a release of a ‘petroleum product or products’ from a ‘petroleum storage system.’” Based on the evidence presented, the hearing officer found certain of the tanks at the rear of the facility had contained waste oil or transmission fluid which had leaked and contaminated the soil. He then specifically found:
19. Finally, it is shown that transmission fluid and waste oil, as well as the other, solvent-related constituents of the contamination at the site are petroleum or petroleum products. They can be, and are used, as a mixture amounting to a “liquid fuel commodity made from petroleum” and such waste petroleum products are often used in Florida, particularly for boiler fuel to fire industrial-type boilers. These compounds found at the site are both petroleum and petroleum products and are hydro *437 carbons, as defined in Section 376.301, Florida Statutes. It was thus demonstrated that the contamination at the facility was the result of a discharge of petroleum products, from a petroleum storage system, in the manner and for the reasons delineated more particularly above.
The hearing officer reached a similar conclusion of law:
30. The contamination was caused, according to the preponderant evidence, by waste oil and transmission fluid, as well as hydrocarbon, petroleum-based solvents. Waste oil and transmission fluid are commonly used as fuel commodities in Florida, predominately as boiler fuel. These findings are largely predicated on the testimony of Mr. Smith, who was best able to testify concerning the nature of the products which leaked into the soils and groundwater and the saturated nature of the soils at the subject site. Mr. Smith supervised the entire project and was on the site practically every day, making his observations. No one from the Department was present during cleanup of the site, and the Department has admitted that no one from the Department visited the site until the day before hearing, approximately five and one-half years after the tanks were removed and the contamination cleaned up. It has been established that the contaminants referenced in the above Findings of Fact constitute petroleum products and petroleum because the waste oils, transmission fluid and the aromatic solvents are all hydrocarbons and are derived from petroleum. Thus, they meet the above statutory definition (citations omitted).
Under section 120.57, Fla. Stat., an agency in its final order may reject or modify the conclusions of law and interpretation of administrative rules over which it has substantive jurisdiction. However, rejection or modification of conclusions of law may not form the basis for rejection or modification of findings of fact. In addition, the agency may not reject or modify the findings of fact unless the agency first determines that the findings of fact were not based upon competent substantial evidence. § 120.57(l)(b)(10), Fla. Stat. (1995). See also Freeze v. Department of Business Regulation, Division of Alcoholic Beverages and Tobacco, 556 So.2d 1204 (Fla. 5th DCA 1990); Florida Department of Corrections v. Bradley, 510 So.2d 1122 (Fla. 1st DCA 1987); Heifetz v. Department of Business Regulation, 475 So.2d 1277 (Fla. 1st DCA 1985).
The Legislature created the Abandoned Tank Restoration Program in response to the need to provide financial assistance for cleanup of sites that have abandoned petroleum storage systems. The Department of Environmental Protection was authorized to establish the Abandoned Tank Restoration Program to facilitate the restoration of sites contaminated by abandoned petroleum storage systems. § 376.305(7), Fla. Stat. (1995). Rule 62-770.160, Florida Administrative Code, provides that the cleanup criteria shall apply to any cleanup of a site contaminated with “petroleum” or “petroleum products.”
The critical issue here is whether waste oil and transmission fluid are “petroleum products” as defined by statute. Section 376.301, Fla. Stat. provides these definitions:
(20) “Petroleum” includes:
(a) Oil, including crude petroleum oil and other hydrocarbons, regardless of gravity, which are produced at the well in liquid form by ordinary methods and which are not the result of condensation of gas after it leaves the reservoir; and
(b) All natural gas, including casinghead gas, and all other hydrocarbons not defined as oil in paragraph (a).
(21) “Petroleum product” means any liquid fuel commodity made from petroleum, including, but not limited to, all forms of fuel known or sold as diesel fuel, kerosene, all forms of fuel known or sold as gasoline, and fuels containing a mixture of gasoline and other products, excluding liquefied petroleum gas and American Society for Testing and Materials (ASTM) grades no. 5 and no. 6 residual oils, bunker C residual oils, intermediate fuel oils (IFO) used for marine bunkering with a viscosity of 30 and higher, asphalt oils, and petrochemical feedstocks.
*438 (22) “Petroleum storage system” means a stationary tank not covered under the provisions of chapter 377 together -with any on site integral piping or dispensing system associated therewith or intended to be used for the storage or supply of any petroleum product....
Contrary to D.E.P.’s position, there was competent, substantial evidence that waste oil and used transmission fluid are often used in Florida particularly for boiler fuel to fire industrial boilers. Nevertheless, says the Department, they cannot be considered “petroleum products” because ... “there was no evidence that the waste oil and transmission fluid generated at this particular facility were actually being recycled and used as fuel.” The Department thus distinguishes between “used oil” which it considers as product actually being recycled from “waste oil” which it considers product intended to be discarded, even though in form, the product is identical. This argument overlooks the fact that the intent of the statute was to reimburse property owners for clean-up of contaminated sites, sites where the product, regardless of its intended use, leaked into and contaminated the soil. To say that an identical contaminant is to be treated differently because of its intended use would be an arbitrary and unreasonable interpretation, not supported by the applicable statutes.
The Department’s own rules support our position here. Rule 62-770.200(12), Florida Administrative Code as pertinent here, defines “used oil” as follows:
‘Used Oil’ means any lubricants for use in internal combustion engines which have been refined from crude oil and, as a result of use, storage or handling, have become unsuitable for their original purpose due to the presence of impurities or loss of properties, but which may be suitable for further use as a fuel or is economically recyclable for use as a fuel.
We find no definition of “waste oil” in Chapter 62 and note that Ober’s witness and the hearing officer appeared to refer to used oil and waste oil interchangeably. We note also that Rule 62-770.200(12) does not require evidence that the lubricant is actually being used as a fuel, but only that it “... may be suitable for further use as a fuel....” There was competent evidence here, accepted by the hearing officer, that lubricants described as waste oil or transmission fluid which had contaminated the soil from certain of the underground tanks could be and were actually used in Florida as fuel. Thus the conclusion of the hearing officer that these lubricants were liquid fuel commodities made from petroleum and thus “petroleum products” as defined by statute was proper and should have been sustained. See Commercial Coating Corporation v. State of Florida, Department. of Environmental Regulation, 548 So.2d 677 (Fla. 3rd DCA 1989).
We reverse the order appealed from, and direct that the recommended order of the hearing officer be adopted.
REVERSED and REMANDED.
COBB and ANTOON, JJ., and ORFINGER, M. Senior Judge, concur.

. As used by the parties, references are to the 1995 statutes.

. Later renamed Department of Environmental Protection.